**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KARA M. GILL, ) | CASE NO. 1:22-CV-01040-CEH |
| ) | |
| Plaintiff, ) | CARMEN E. HENDERSON |
| ) | UNITED STATES MAGISTRATE JUDGE |
| v. ) | |
| ) | MEMORANDUM OF OPINION & ORDER |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant, ) | |
| ) | |

**I. Introduction**

Plaintiff, Kara M. Gill ("Gill" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 8). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and dismisses Claimant's Complaint.

**II. Procedural History**

On January 30, 2020, Claimant filed an application for DIB, alleging a disability onset date of May 1, 2012. The application was denied initially and upon reconsideration and Claimant requested a hearing before an administrative law judge ("ALJ"). On April 16, 2021, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 6, PageID #: 65-90, Tr. at 32-57). On May 4, 2021, the ALJ issued a written decision finding that Claimant was not disabled. (*Id.* at PageID #: 43-64, Tr. at 43-31). The ALJ's

decision became final on April 12, 2022, when the Appeals Council declined further review. (*Id.* at PageID #: 34, Tr. at 1).

On June 15, 2022, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 9, 10, and 12). Claimant asserts the following assignments of error:

1. Prior to Step Four, the ALJ failed to obtain further opinion evidence before completing the PRT and crafting a mental RFC despite his acknowledging that there was a critical body of objective medical evidence that was not accounted for by a medical opinion.

2. Prior to Step Four, the ALJ failed to obtain further opinion evidence before crafting a physical RFC despite his acknowledging that there was a critical body of objective medical evidence that was not accounted for by a medical opinion.

(ECF No. 9).

**III. Background**

   **A. Relevant Hearing Testimony**

The ALJ summarized the relevant testimony from Claimant's hearing:

> At the April 16, [2021] hearing, the claimant testified she was unable to work prior to her date last insured because of seizures. She testified that she experienced headaches 2-3 times a week and her shoulders and neck were in constant pain throughout the day. She testified that her shoulder and neck pain were a 5-6 on the pain scale with medication and without medication she was an 8-9 on the pain scale. She testified that her impairments worsened. She testified she has difficulty talking with people, finding the appropriate words and poor memory. She testified that her conditions were aggravated by stress and insufficient sleep. She testified her condition were helped with exercise (lifting weights and walking or hiking in nature). She testified that she was able to sit 2-3 hours, stand for 2-3 hours, walk without issues, and lift 20 pounds. She testified that she lived with her spouse and three children. She testified she was able to perform self-care (brush teeth, bathe, and took her medication with

2

>reminders). She testified she visits with her inlaws 2-3 times a month. She testified she cared for her children. She testified she watched television, used the internet/computer (Facebook) to keep up with her friends and family. She testified she was able to make change and count money. She testified she performed 50% of the household chores in 30 minute increments (such as cooking, washing the dishes, laundry, dusting, vacuuming, sweeping, mopping) and her husband and children completed the balance. She testified she gardens with her children and she maintained the flowerbeds. She testified side effects from her medications include increased infections and weight loss. She testified she experienced weight loss due to anxiety, exercise and medication.

(ECF No. 8, PageID #: 53, Tr. at 20).

### B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

>On May 17, 2012, the claimant was seen for her complaint of epilepsy (Exhibit 2F, p. 341). The claimant has had epilepsy since her early teens. Her last convulsion was years ago and her last partial seizure was many months ago. She reported she has been better. Her mood was good, but her energy level was still low. Examination noted she was in no distress. The neck was supple with no cervical adenopathy or carotid bruit. The lungs were clear to auscultation. She had a regular heart rate and rhythm with no murmurs, clicks or gallops. Radial pulses were palpable. The spine was straight. She was awake, alert and oriented. Motor strength was 5/5. Sensation was normal to light touch and temperature. Reflexes were 2/4 in the bilateral upper extremities and 3+/4 in the bilateral lower extremities. Her gait was normal. The impression was focal epilepsy and seizures were well controlled.

>The claimant reported on November 1, 2012 that she has rare focal events (Exhibit 2F, p. 335). She reported she was no longer working and she was asked to leave her job. She reported she is feeling less stressed, but somewhat more depressing. She stated that she was keeping herself busy with children and activities, but she was feeling more socially isolated. She has headaches 2-3 days per week. She has been exercising, but for several weeks she has been having some lightheadedness after about 15 minutes of exercise. She had no lightheadedness upon standing. She denied vertigo. Examination remained unchanged from May 12, 2012. The impression was epilepsy (seizures controlled on Tegretol and Keppra), migraines and fatigue and poor sleep. Neurology appointment on May 17,

3

2013 noted the claimant has a history of epilepsy (Exhibit 2F, p. 324). The claimant reported she has had no seizures since staring Keppra last year. She has some problems with abscesses and she was treated with antibiotics for some time. Her mood was okay. Examination noted she was in no distress. Her neck was supple. The lungs were clear to auscultation. She has a regular heart rate and rhythm. She was awake, alert and oriented. Motor strength was 5/5. Sensation was normal to light touch and temperature. Reflexes were 2/4. Her gait was normal. The impression was that her seizures were controlled on current medications.

It was noted on December 18, 2013 that the claimant had a recent seizure in the setting of a viral illness (Exhibit 2F, p. 321). Her medication was change[d] to Keppra from Carbamazepine due to leukopenia. Her depression was stable on Prozac. Examination remained unchanged from May 17, 2013.

On May 5, 2014, it was noted that the claimant has not had a seizure since her last visit (Exhibit 2F, p. 300). The claimant was doing well on Trileptal. She stated that she no longer feels as if she will have a seizure. Her mood was okay. Examination remained unchanged from December 18, 2013. The impression was epilepsy (no seizures) and depression (stable on Prozac).

The claimant was seen on June 4, 2014 for her complaint of numbness and weakness of the left hand (Exhibit 2F, p. 295). Examination noted she was in no distress. The neck was supple. The lungs were clear to auscultation. She had a regular heart rate and rhythm. She was awake, alert and oriented. She had 4/5 weakness in left tricep, 3/5 weakness in left finger abduction, and all other motor strength was 5/5. Sensation was reduced to pinprick in the left 1-4 digits, worse in the 3rd and 4th; otherwise okay to light touch, temperature and pinprick. Tinel's and Phalen's were absent at the wrist and elbow. Reflexes were 2/4 in the upper limbs and 3+/4 in the lower limbs. She had 4 beats of clonus on the left and 6 beats of clonus on the right. Hoffman's test was positive bilaterally. Her gait was normal. The impression was epilepsy and left hand weakness.

Magnetic resonance image (MRI) of the cervical spine on June 13, 2014 noted asymmetric uncovertebral spurring and broad-based disc osteophyte complexes towards the left results in moderate to severe left neural foraminal narrowing at C5-C6 and moderate neural foraminal narrowing at C6-C7 (Exhibit 2F, p. 495). Moderate encroachment of the anterior CSF space at C5-C6 and C6-C7 without evidence of cord compression.

4

It was noted on June 18, 2014, it was noted the left hand weakness had improved significantly (Exhibit 2F, p. 286). The numbness is in the ulnar distribution and finger abduction.

Timothy Moore, M.D., evaluated the claimant on June 25, 2014 for her complaint of left sided misery (Exhibit 2F, p. 286). The claimant has left arm numbness from her elbow down, left arm pain, left leg pain and weakness of the left leg. She has no right sided symptoms. She has no real neck misery. Examination noted she was alert and oriented x3. She was in no acute distress. Lower extremity examination noted she rises from a seated position without difficulty. She can toe walk, heel walk and tandem walk, and do repetitive single leg heel rise. She was able to get on and off the examination table without difficulty. Straight leg raise was negative. Muscle strength was 5/5. Sensation was globally intact to light touch L2 to S1 dermatomes. Deep tendon reflexes are normoactive and equal, knee jerk and ankle jerk. She had full range of motion of the hips, knees, and ankles. Pedal pulses were palpable. Upper extremity examination noted she was a little bit weak in her left side compared to the right, sort of globally but mostly in her triceps, intrinsic and hand grip. Deep tendon reflexes were normoactive and equal. She has flicker of Hoffman's sign bilaterally. She has full range of motion of the shoulders, wrists and elbows. Radial pulses were palpable. Cervical spine range of motion is full, nontender and no step offs. Lumbar spine range of motion is fairly normal. Dr. Moore's impression was that the left sided symptoms are not coming from her cervical spine.

On July 16, 2014, the claimant was seen for her complaint of pain in the left neck (Exhibit 2F, p. 282). Her hand strength had improved. She stated she has been having pain radiating from the left neck down the arm. Examination remained unchanged from May 12, 2012. The impression was epilepsy, C8 segmental process (no ongoing nerve fiber loss and improved clinically), and cervical disc disease, now with neck pain and radicular complaints.

X-ray of the thoracic spine on December 15, 2014 noted no acute bony abnormalities (Exhibit 6F, p. 12). Computed tomography (CT) of the cervical spine showed no acute fracture or traumatic malalignment. CT of the head showed no evidence of an acute infraction or hemorrhage. There was no midline shift. Findings were suggestive of sinusitis. X-ray of the left knee showed no acute bony abnormality or definite joint effusion identified. Soft tissue swelling, consider inflammatory process.

The claimant reported on January 16, 2015 that her neck pain comes

and goes (Exhibit 2F, p. 277). She reported she was still going exercises. Gabapentin provides relief. Her mood has been stable. She has not had any seizures and she was compliant with her medications.

Physical examination on September 10, 2015 noted she was in no acute distress (Exhibit 2F, p. 259). She had a regular heart rate and rhythm with no murmurs, gallops or rubs. The lungs were clear to auscultation. Muscle strength and gait were within normal limits. Cranial nerves were intact. Cerebellar function was normal. Deep tendon reflexes were within normal limits. She was assessed with generalized anxiety disorder, epilepsy, and hyponatremia.

It was noted on November 6, 2015 that MRI of the head demonstrated abnormalities of the left hippocampus suggestive of mesial temporal sclerosis (Exhibit 2F, p. 251).

On April 22, 2016, the claimant was seen for a seizure appointment (Exhibit 2F, p. 240). The claimant had no convulsions in some time. She had a focal event without loss of consciousness on November 5, 2015. She has had no seizures since starting Lamotrigine. She has cervical radiculopathy and her pain is well controlled. Examination noted she was in no distress. Her neck was supple. The lungs were clear to auscultation. She has a regular heart rate and rhythm without murmurs, clicks or gallops. She was awake, alert and oriented. Sensation was intact to light touch and temperature. Motor strength was 5/5 throughout. Her muscle tone and bulk were okay. Reflexes were 2/4. Her gait [was] normal. The impression was epilepsy and cervical radicular pain.

The claimant reported on February 15, 2017 that she had a focal seizure while driving yesterday (Exhibit 2F, p. 233). She did not feel right so she pulled to the side of the road. She did not put the car in park so she rolled. The police were on the scene talking to her, but she was confused and having trouble getting words out. She reported she had some headaches lately. Examination remained unchanged from April 22, 2016. The impression was epilepsy and cervical radicular pain.

On June 8, 2017, the claimant was seen for her complaint of depression (Exhibit 2F, p. 225). The claimant reported she started on Lexapro and she was feeling better. She reported she was more active. She denied suicidal or homicidal ideations. She feels like she has little energy. She reported she has not had seizures and she is complaint with her medications. Examination noted she was awake, alert and oriented. It was noted that her depression had improved.

> The claimant received mental health treatment through Nord Counseling Services (Exhibit 1F). On November 2, 2017, it was noted the claimant had a depressed mood. She had difficulty getting out of bed due to "not sleeping well, not being able to force myself." She reported her mood affects her home life. She feels like she has to force herself to keep moving at times. She has anxiety and her mind goes blank. She has sleep disturbance, she is irritable, she has muscle tension, and she has headaches and chest tightness. She has a history of emotional abuse, sexual abuse/molestation during childhood. She reports episodes of anger and/or aggression, frequent irritability, and crying spells. She had difficulty concentrating, loss of interest, fatigue, altered appetite and worthlessness. She appears to have mild impairment of attention. She reports her current medications have been helpful with her increasing mood. She reports low energy, diminished and worthlessness. She appeared alert and oriented x3 with a depressed mood. She was cooperative. Her thought process was logical. Her mood was depressed. Her affect was full. Her attention and concentration were mildly impaired. She denied suicidal or homicidal ideations. She was diagnosed with major depressive disorder, moderate, recurrent episode and generalized anxiety disorder. On December 19, 2017, the claimant was very anxious.
>
> Neurology appointment on December 21, 2017 noted the claimant has not had any seizures and she was complaint with medications (Exhibit 2F, p. 220). Examination remained unchanged from February 15, 2017. The impression was epilepsy (no events and no medication side effects), cervical disc disease with radicular pain (pain controlled with Gabapentin), and depression (severe at times).
>
> The undersigned acknowledges that the record contains evidence subsequent to the date last insured of December 31, 2017 (Exhibits 2F, and 5F-7F). The undersigned did not articulate on this evidence because it is not helpful in determining the claimant's limitations during the relevant period.

(ECF No. 6, PageID #: 53-57, Tr. at 20-24).

### C. Opinion Evidence

In May 2020, state agency medical consultant Mehr Siddiqui, M.D., found that there was insufficient evidence to evaluate Claimant's functioning prior to her date last insured. (ECF No. 6, PageID #: 92, Tr. at 59). That same month, state agency psychological consultant Jamie Lai,

found that there was insufficient evidence to evaluate Claimant's mental functioning prior to her date last insured. (ECF No. 6, PageID #: 93, Tr. at 60).

In July 2020, state agency medical consultant Leon Hughes, M.D., affirmed Dr. Siddiqui's finding regarding the lack of sufficient evidence to evaluate Claimant's functioning prior to her date last insured. (ECF No. 6, PageID #: 97, Tr. at 64). That same month, state agency psychological consultant Paul Tangeman, Ph.D., affirmed Ms. Lai's finding regarding the lack of sufficient evidence to evaluate Claimant's mental functioning prior to her date last insured. (ECF No. 6, PageID #: 97, Tr. at 65).

The ALJ found each of these opinions unpersuasive and stated that "[t]he State Agency consultant's [sic] did not have the benefit of the claimant's complete medical evidence of record. The totality of the evidence supports severe physical and mental health impairments that impose exertional and non-exertional limitations prior to the date last insured. The undersigned added limitations to account for her treatment and subjective complaints." (ECF No. 6, PageID #:57, Tr. at 24).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 4. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: She can occasionally reach overhead with the right and the left upper extremities. She can frequently reach in all other directions with the right and the left upper extremities. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. She has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work).

> She is limited to simple work related decisions in using her judgment and dealing with changes in the work setting. She is able to frequently interact with supervisors, coworkers, and the public.

9. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

10. The claimant was not under a disability, as defined in the Social Security Act, at any time from May 1, 2012, the alleged onset date, through December 31, 2017, the date last insured (20 CFR 404.1520(g)).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be

affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

In both issues raised by Claimant, she asserts that the ALJ improperly determined her RFC without obtaining further medical opinion regarding functionality.[1] It is undisputed that the record

---

[1] Gill captions her issues stating that the ALJ acknowledged that a "critical body of objective medical evidence" was unaccounted for by a medical opinion. (*See* ECF No. 9 at 1).

10

contains no medical opinion regarding Claimant's physical or mental functional abilities. Although Claimant's medical records were reviewed by four State Agency medical consultants, each opined that there was insufficient evidence in the file to evaluate Claimant's functioning prior to the date last insured. (*See* ECF No. 6, PageID #: 92, 97-98, Exs. 1A & 3A). The ALJ explained that the State Agency medical consultants were not given the entire file, thus their opinions were unpersuasive. Then, having reviewed the entire file, the ALJ set forth Claimant's mental and physical limitations. Claimant, citing this Court's decision in *Gonzales v. Comm'r of Soc. Sec.*, 3:21-CV-00093-CEH, 2022 WL 824145, at *8 (N.D. Ohio Mar. 18, 2022), argues the ALJ erred by not obtaining further medical opinion evidence before crafting the RFC.

The Sixth Circuit has explicitly rejected the premise that an ALJ must rely on a medical opinion to craft an RFC. *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached."). An ALJ must develop a "complete medical history for at least the 12 months" prior to the filing of a claimant's application. 20 C.F.R. § 416.912. Nonetheless, the claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. *Id*.

"[U]nder special circumstances—when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures—an ALJ has a special,

---

However, this is a mischaracterization of the ALJ's statement. In finding the State Agency opinions unpersuasive, the ALJ noted that "[t]he State Agency consultant's [sic] did not have the benefit of the claimant's complete medical evidence of record. The totality of the evidence supports severe physical and mental health impairments that impose exertional and non-exertional limitations prior to the date last insured." (ECF No. 6, PageID #: 57, Tr. at 24). The ALJ never stated that a critical body of objective medical evidence was unaccounted for by a medical opinion.

heightened duty to develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (*citing Lashley v. Secretary of HHS*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). Gill does not allege that any of these special circumstances exists.

In the absence of such special circumstances, an ALJ has discretion to determine whether further evidence is necessary. *See Pasiak v. Comm'r of Soc. Sec.*, No. 19-1212, 2019 WL 6698136, at *1 (6th Cir. Dec. 9, 2019) (" 'An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary.' ") (quoting *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests.") (emphasis added))). When the record contains a sufficient amount of evidence pertaining to an impairment, an ALJ does not abuse his discretion by declining to obtain an additional assessment. *See Culp v. Comm'r of Soc. Sec.*, 529 F. App'x 750, 751 (6th Cir. 2013) ("Given that the record contained a considerable amount of evidence pertaining to Culp's mental limitations [including] a mental RFC assessment in March 2008, the ALJ did not abuse her discretion by declining to obtain an additional assessment."); *Robertson v. Comm'r of Soc. Sec.*, 513 F. App'x 439 (6th Cir. 2013) (because the record contained test results, physicians' notes, opinion evidence from multiple physicians, and lacked any significant inconsistencies in the evidence, the ALJ was not obligated to order a consultative examination with a cardiologist or obtain additional medical records.); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").

The ALJ did not abuse their discretion in determining Gill's mental or physical RFC without obtaining further medical opinion regarding Gill's functional ability because the record contained sufficient evidence for the ALJ to make their determination. Although the reviewing physicians could not make a determination as to Gill's functional abilities, the ALJ reviewed more evidence than the reviewing physicians including additional medical records, Gill's disability report, and Gill's hearing testimony. More specifically, the reviewing physicians reviewed Gill's medical records from MetroHealth dated November 22, 2011, to February 3, 2020, and from Nord Counseling dated November 2, 2017, to December 19, 2017. (*See* ECF No. 6, PageID #: 92, Ex. 1A (referencing MetroHealth HIT MER located at Exhibit 2F and Nord Counseling dated November 2, 2017, to December 19, 2017, located at Exhibit 1F)). From these records, the reviewing physicians found insufficient evidence to evaluate Gill's functioning. The ALJ also reviewed these records and specifically cited to them in their decision. (*Id*. at PageID #: 53-57 (noting that Claimant denied convulsions or seizures in May 2012, November 2012, May 2014, July 2014, January 2015, April 2016, and December 2017 and that her imaging and examinations were generally unremarkable) (citing Tr. 463, 482, 520, 527, 542, 578, 584); PageID #: 51-56, Tr. at 18-23 (noting that the record was devoid of any mention of memory issues, that Claimant was consistently described as pleasant and cooperative and appeared comfortable during appointments, that the record failed to show any mention of distractibility or problems with temper control and that she consistently exhibited normal mood and affect, and that Plaintiff's depression remained stable while on her medication)). In addition to these records, however, the ALJ reviewed hospital records from University Hospitals dated from January 9, 2012, to October 13, 2018 (*see id*. at PageID #: 987, Ex. 6F) and records from University Hospitals Elyria Medical Center dated from January 11, 2016, to December 7, 2017 (*id*. at PageID #: 1118, Ex. 7F). The ALJ specifically

13

referenced these additional records in their explanation for why Gill's allegations were only partially consistent with her symptoms. (*See id*. at PageID #: 57 (citing to Ex. 6F); PageID #: 58 (citing to Ex. 7F). The ALJ also considered the Disability Report dated August 18, 2020, which highlighted Gill's post-date last insured gall bladder surgeries and medication changes. (*See id*. at PageID #: 53 (citing Ex. 6E)). Additionally, the ALJ heard and considered Gill's hearing testimony that she was able to sit two to three hours, stand for two to three hours, walk without issues, and lift twenty pounds and that her condition was helped with exercise such as lifting weights and walking or hiking in nature. (*Id*.). The ALJ considered Gill's testimony regarding her ability to perform activities of daily living, including self-care; caring for three children; performance of 50% of the household chores in thirty-minute increments, including cooking, washing the dishes, laundry, dusting, vacuuming, sweeping, and mopping; and gardening and maintaining the flowerbeds. Finally, the ALJ noted the absence of evidence that Gill's prescribed medication is accompanied by side effects that would interfere significantly with her ability to perform work within the restrictions outlined in this decision and that, despite the voluminous medical records "[n]o treating source refers to the claimant as having incapacitating or debilitating symptoms that would prevent her from returning to the workplace at a reduced level of exertion such as in the performance of light work, or has otherwise described the claimant as 'totally and permanently disabled' by her impairments and complaints." (*Id.* at PageID #:58).

Based on the entirety of the record before them, the ALJ found that Gill had the capacity to:

> perform light work as defined in 20 CFR 404.1567(b) except: She can occasionally reach overhead with the right and the left upper extremities. She can frequently reach in all other directions with the right and the left upper extremities. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She

> can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. She has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work). She is limited to simple work related decisions in using her judgment and dealing with changes in the work setting. She is able to frequently interact with supervisors, coworkers, and the public.

(ECF No. 6, PageID #: 52, Tr. 19). Although Gill suffered from epilepsy, arthritis in her spine, depression, and anxiety, sufficient evidence supports the RFC's functional limitations. For example, the record shows that she had consistently normal gait (*see e.g. id.*, Tr. at 390, 485, 488, 492, 496, 504, 507, 515, 518, 522, 527, 992, 1097, 1126, 1126); normal strength (*see id.,* Tr. at 356, 367, 390, 488, 504, 1129); normal sensation (*see id.,* Tr. at 252, 266, 282, 290, 344, 362, 367, 390); normal reflexes in her arms (*see id.,* Tr. at 253, 266, 283, 291, 245, 263); improvement in her left arm and hand pain (*see id.,* Tr. at 525, 532), and a lack of seizures and convulsions (*see id.,* Tr. at 463, 482, 520, 527, 532, 542, 578, 584 (denying seizures/convulsions); Tr. 542 and 586 (seizures were "well controlled")). Also, Gill testified that she had no problems walking and could lift twenty pounds comfortably -- both of which are consistent with the requirements of light work. As for the mental limitations, the ALJ considered Claimant's depression and anxiety but noted that that the record was devoid of any mention of issues with long or short-term memory, nor did it show any evidence of distractibility or problems with temper control. Instead, the record showed that Gill was consistently described as pleasant and cooperative and appeared comfortable during appointments (*see id.*, Tr. at 268, 277, 298, 303, 307, 326, 401, 497, 534, 536, 1182 ("appears much more comfortable at time of discharge. Does not appear anxious or jittery"); she consistently exhibited normal mood and affect (*see id.,* Tr. at 261, 274, 296, 314, 332, 408, 417, 453, 556, 584, 1129, 1207), and reported improvement in her symptoms with the use of medications (*see id.,* Tr. at 586, 565, 468-70). Finally, Gill's reported activities of daily living support the ALJ's functional

15

limitations: Gill interacted with friends and family, was consistently social with her extended family, was responsible for about 50% of the household chores, handled and counted change and money, performed her own self-care, and had hobbies including gardening. (*Id.* at Tr. 46-50).

Ultimately, it is the claimant's burden to prove her RFC and it is the ALJ's responsibility to determine the RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations. *See Her v. Comm'r*, 203 F.3d 388, 391 (6th Cir. 1999). Here, the record had sufficient evidence to determine Gill's functional limitations and the ALJ included such physical and mental limitations in the RFC as were supported by the record. Gill fails to explain how the medical evidence demonstrates any more than minor impairments to her functioning, which were accounted for by the ALJ in the RFC. Accordingly, because substantial evidence supports the ALJ's finding, the ALJ's determination is conclusive. *Foster*, 279 F.3d at 353.

Finally, Gill's reliance on *Gonzales* is misplaced. In *Gonzales*, this Court stated that "an ALJ is required to obtain a medical opinion in furtherance of her 20 CFR § 404.1545(a)(3) responsibility to develop the record . . . where the medical evidence requires the ALJ to make medical judgments of a claimant's functional abilities by interpreting raw medical data" or when "a 'critical body' of the 'objective medical evidence' is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions." *Gonzales*, 2022 WL 824145, at *8 (emphasis added) (citations omitted). However, *Gonzales* is not instructive as neither of these circumstances is present here.

Gill does not allege that the ALJ interpreted "raw medical data".  Instead, Gill argues that "there is significant evidence of potentially disabling conditions and the evidence *post-dating the State Agency consultants' opinions* constituted a critical body of the objective medical evidence that was not accounted for by a medical opinion." (ECF No. 9 at 9) (citing *Gonzales*, 2022 WL

16

824145, at *8) (emphasis added). Gill does not develop this argument nor explain in any way how any evidence post-dating the reviewing physicians' review of the records constitutes a "critical body of the objective medical evidence." Notably, none of the evidence Gill cites to post-dates the state agency reviews. Instead, the earliest state agency review occurred on May 29, 2020 (*see* ECF No. 6, PageID #: 92, Ex. 1A), which is two-and-a-half years after Gill's date last insured (December 31, 2017). Gill does not argue that there is any evidence post-dating the state agency opinions; rather, the only evidence Gill cites to existed prior to May 29, 2020. Thus, this is distinguishable from *Gonzales*.

Moreover, Gill has not explained how the medical evidence in the record is such that *required* a medical opinion. With respect to her mental RFC, Gill cites to notations of depression in May and October of 2015 and returning in May of 2017 and anxiety in 2015 in support of her argument that a medical opinion was required. (*See* ECF No. 9 at 8). However, the ALJ clearly considered each of these records and more. The medical evidence reviewed by the ALJ included Gill's November 2017 Diagnostic Evaluation (ECF No. 6, PageID #: 258-269, Ex. 1F) and her medical records from MetroHealth dated November 2, 2017, to February 3, 2020 (*d.* at PageID #: 276-911, Ex. 2F). The ALJ also reviewed and relied upon Gill's medical records from her mental health treatment at Nord Counseling Services, where she began services a month prior to her date last insured. (*Id.* at PageID #: 56-57, Tr. at 23-24). Here, the ALJ reviewed the medical evidence cited by Gill and, as discussed above, the ALJ made the required connection "between the evidence relied on and the conclusion reached." *See Tucker*, 775 F. App'x at 226. Accordingly, substantial evidence supports the ALJ's finding; thus, the ALJ's determination is conclusive. *Foster*, 279 F.3d at 353. Although the reviewing physicians found insufficient information to provide an opinion, as discussed above, the ALJ reviewed additional evidence – none of which

17

contained objective medical evidence requiring a medical opinion. Gill argues that "citations to some normal exam results and [Claimant's] behavior in a clinical setting with trained mental health professionals [ ] is not sufficient for the layperson ALJ to render an opinion." (ECF No. 12 at 2). The mere fact that Gill had a medical history does not require an ALJ to request a medical consultation and Gill does not explain why the medical evidence here *required* a medical opinion. Such a requirement would negate the language of 20 C.F.R. §§ 404.1517, 416.917 and existing case law acknowledging that an ALJ has the discretion to determine when an additional medical opinion is necessary. *See Pasiak*, 2019 WL 6698136, at *1; *Foster*, 279 F.3d at 355. Gill has not demonstrated that the ALJ abused this discretion.

Accordingly, Gill has failed to demonstrate that the ALJ erred by not obtaining further opinion evidence before crafting her mental RFC.

In support of her argument that the ALJ was required to obtain further medical opinion regarding her physical functional abilities, Gill refers to spinal images from June 2014, which "revealed moderate to severe left neural foraminal narrowing at C5-6, moderate neural foraminal narrowing at C6-C7, and moderate encroachment of the anterior CSF space at C5-6 and C6-7 without evidence of cord compression." (ECF No. 9 at 10). Although ALJs are generally unqualified to interpret raw medical data (*see Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *9 (N.D. Ohio Sept. 29, 2021)), the ALJ did not do so here. The imaging study cited by Claimant was reviewed by a medical professional whose impression of that study was considered by the ALJ. (*See* ECF No. 6 at PageID #: 55, Tr. at 22). The medical records explain that the results of that MRI "maybe" show "a little bit more than age appropriate spondylosis [ ] at C5-6 and C6-7", but that there was "no significant spinal cord compression" and "[n]o significant foraminal stenosis on the left side." (*Id*. at PageID #: 561, Ex. 2F). The medical record

notes that the spondylosis is not what is causing Gill's pain. (*Id*.). Accordingly, the only evidence cited by Gill was properly considered by the ALJ.

Gill fails to demonstrate that the ALJ erred by not obtaining additional opinion evidence regarding her physical functional limitations.Here, the ALJ carefully considered Gill's treatment history during the relevant period spanning from 2012 through 2017 and made a permissible judgment about Gill's functional capacity.

Accordingly, Gill has failed to demonstrate that the ALJ erred by not obtaining further opinion evidence before crafting her physical RFC.

## VI. Conclusion

Based on the foregoing, it the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Plaintiff's Complaint.

Dated: September 25, 2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE